# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### NORTHERN DIVISION

NANCY K. KNOTTS,        )
                                )
        **Plaintiff,**      )
                                )
    **vs.**             )        **Case No. 2:06CV62JCH/MLM**
                                )
**MICHAEL J. ASTRUE,[1]**    )
**Commissioner of Social Security,**  )
                                )
        **Defendant**     )
                                )

## REPORT AND RECOMMENDATION OF
## UNITED STATES MAGISTRATE JUDGE

This is an action under Title 42 U.S.C. § 405 (g) for judicial review of the final decision of Michael J. Astrue ("Defendant") denying the application of Nancy K. Knotts ("Plaintiff") for Disability Insurance Benefits under Title II of the Social Security Act (the Act), 42 U.S.C. § 401 et seq., and for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381, et seq. Tr. 18-21, 64-66. Plaintiff filed a brief in support of the Complaint. Doc.11. Defendant filed a brief in support of the Answer. Doc. 13. The cause was referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to Title 28 U.S.C. § 636(b)(1). Doc. 3.

## I.
## PROCEDURAL HISTORY

Plaintiff filed applications for disability benefits alleging a disability onset date of September

---

[1]    Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should, therefore, be substituted for Jo Anne B. Barnhart as the Commissioner of Social Security.

1, 2001.[2] Tr. 17, 97, 101, 152, 882-86.  Plaintiff's applications were denied. [3] Tr. 83-84, 86-89, 887-91.  Plaintiff requested a hearing, which was held January 8, 2004, before Administrative Law Judge ("ALJ") William E. Kumpe. Tr 101.  By decision dated April 15, 2004, the ALJ determined that Plaintiff was not under a disability as defined in the Social Security Act. Tr. 111.  On May 13, 2005, the Appeals Council granted Plaintiff's request for review of the ALJ's decision and remanded the case for further development. Tr. 109-112.  A supplemental hearing was held before ALJ Robert G. O'Blennis on September 29, 2005. Tr. 109, 113. By decision dated June 22, 2006, ALJ O'Blennis issued a decision finding that Plaintiff was not disabled through the date of the decision. Tr. 13-23. On September 6, 2006, the Appeals Council denied Plaintiff's request for review of the 2006 ALJ's decision.  Tr. 8-10.  As such, the ALJ's decision stands as the final decision of the Commissioner.

## II
## TESTIMONY BEFORE ALJ KUMPE

Plaintiff testified that, at the time of the hearing, she was forty years old and lived in a house with her husband and fifteen year old son; that she graduated from highschool; that she completed a LPN program; and that she has a LPN license.

Plaintiff further testified that she last worked at Sheridan Valley Association for Handicapped Citizens ("Sheridan Valley") as a community integration specialist; that her duties in that position

---

[2]     Plaintiff initially alleged a disability onset date of March 27, 2001.  She subsequently amended her applications alleging an onset date of September 1, 2001.

[3]     Missouri is one of several test states participating in modifications to the disability determination procedures which apply in this case. See 20 C.F.R. § § 404.906 and 404.966 (2002). These modifications include, among other things, the elimination of the reconsideration step and at times, the elimination of the Appeals Council review step in the administrative appeals process. See id. Therefore, Plaintiff's appeal in this case proceeded directly from her initial denial of benefits to the administrative law judge level.

included taking clients shopping, to the library, and to ball games; that she worked at Sheridan Valley for three years and last worked there in 2001; that she left Sheridan Valley in 2001 because of a back injury she sustained while on the job; that when she returned to Sheridan Valley after her injury she was put in a different position and could not do the work because of pain and the strain on her back; and that prior to Sheridan Valley she worked at Northeast Regional Medical Center as a LPN for six years. Tr. 57-58.

Plaintiff testified that she received physical therapy, manipulation therapy, and medications for her back; that she had multiple steroid injections in her back, the last of which she had in June of 2005; that her medications include Zanaflex, Effexor, Tylenol #3, Valium, Kadian, and Zantac; that at the time of the hearing she had been taking Zanaflex for three years, Tylenol #3 for three years, Valium for two years, Kadian for three years, and Zantac for about fifteen years; that she had recently started taking Effexor "to get a better sleep pattern"; that at times, after taking medication, she has "a hard time functioning the next day" because she has a "groggy hangover feeling"; and that she did not know which of her medications causes this side effect. Tr. 62-63.

Plaintiff stated that on a typical day she rests on a bed and a sofa; that she does not do any household chores such as cooking, cleaning or laundry; that she watches television and reads; that she occasionally goes to the store, library, and visits her father and sister in Kirksville; that she attends her son's 4H meetings once a month, which last an hour; that she attends the movies once every six months; and that the only personal hygiene function she has difficulty performing is bathing because it is hard for her to get in and out of the bathtub. Tr. 64-66. Plaintiff further stated that someone drove her to the hearing; that the car trip took approximately one hour; that the car stopped once, halfway through the trip, so that she could walk around for a few minutes. Tr. 55-56.

3

Plaintiff testified that she had micro-diskectomy surgery in November of 2004; that this surgery helped her pain for three weeks; that after three weeks her pain returned to its usual level of about a seven or eight out of ten; that she had physical therapy from December of 2004 to July of 2005; that she was released from physical therapy "because they [had] no idea what else to do to try to get [her] pain under control." Tr. 68.

Plaintiff further testified that the heaviest thing she can lift is a gallon of milk; that she can sit fifteen to twenty minutes before she has to stand; and that she can stand ten to fifteen minutes before having to sit. Tr. 68-69. Plaintiff also testified that her pain level at the hearing was a seven out of ten, which was representative of how she typically felt; that her pain was constant; and that there was nothing a doctor suggested for her that she had not done. Tr. 69-70.

## III.
## MEDICAL RECORDS

Dr. Kevin Cline, of Mid America Orthopedic, reported on May 11, 2001, that Plaintiff was pulling a patient in a wheelchair when she fell and had to hold the chair to keep it from rolling down a hill. Tr. 210.

An accident report, dated May 18, 2001, states that Plaintiff was attempting to pull a client up a hill at a softball field when she slipped under the client's chair and that Plaintiff held onto the chair so the client would not roll down the hill. Tr.272.

A report from an MRI study dated May 18, 2001, states that the impression was no evidence of herniated disk, bulging disk, stenosis, fracture or metastatic disease. Tr. 219.

Dr. Cline reported on June 4, 2001, that Plaintiff said that she was "not better, no worse. It's worse to sit, than to stand." Tr. 211.

Dr. Cline reported on June 25, 2001, that Plaintiff stated that she still had left leg pain and that

4

she could not walk very far or sit very long. Tr. 212.

Dr. Cline reported on July 18, 2001, that Plaintiff fell on her lower back; that she said she was "much better; that Plaintiff had returned to work; and that the plan was for her to have full duty. Tr. 213.

Emergency room records of July 31, 2001, reflect that Plaintiff started back to work after being off for six weeks due to a low back injury; that for several days prior to visiting the emergency room she had increasing discomfort; that x-rays of the lumbar spine were negative; and that Plaintiff was diagnosed with lumbar strain. Tr. 220. An x-ray report dated July 31, 2001, states that no fractures or arthritic changes were identified and that the conclusion was a "normal outline of the lumbar spine." Tr. 221.

David Vick, D.O., reported on September 18, 2002, that Plaintiff was seen for complaints of low back pain; that her pain was predominately on the left side of her lower back; that her pain was worse in the morning; that her pain was made better with hot baths; that Plaintiff weighed 258 pounds; that her blood pressure was 110/60; that examination showed some tightness in the left gluteus medius and piriformis; that there were no specific tender points that could be located in those muscles; that Plaintiff's muscle strength was 4/5 throughout all muscles of the left lower extremity; that muscle strength of the right lower extremity was 5/5; that in a seated position Plaintiff's "straight leg raising test did not elicit specific back or leg complaints"; that in a supine position straight leg raising revealed pain in the low back with a pulling sensation in both legs; that the assessment included low back pain, obesity, and somatic dysfunction of the lumbar, sacral, and pelvic regions; that "OMT was provided including muscle energy and indirect balance ligamentous tension to those areas"; that Plaintiff "tolerated [this] treatment, however, there was no change in her pain"; that

Plaintiff was prescribed Zanaflex for muscle spasms and told she could take Ibuprofen; that Plaintiff was to be seen by Paul Jones, D.O., to see if he could help determine the specific nature of Plaintiff's back pain; and that Plaintiff was to return to Dr. Vick one week after she saw Dr. Jones. Tr. 411.

Dr. Jones's records of October 17, 2002, reflect that Plaintiff reported the following: that after her accident at work where she landed on her left buttocks she saw Dr. Early, who diagnosed her injury as a strain; that she was referred to Dr. Cline; that an MRI was negative for herniated discs; that Plaintiff saw Dr. Sparks for manipulation; that Dr. Sparks sent Plaintiff to Dr. Kindernecht who prescribed physical therapy; that Plaintiff had SI joint injections with "only a brief resolution of her pain"; that x-rays of Plaintiff's back were normal; that Plaintiff subsequently saw Dr. Collins who referred her to Dr. Caldwell for manipulation; that her care was transferred to Dr. Douglas for manipulation; that manipulation did not relieve Plaintiff's pain; that Plaintiff was unable to sit very well or stand for a long time; that bending caused pain; that her pain was 7/10 "with 10 being suicidal and 0 being no pain"; that she was not depressed; and that she was not sleeping very well. Dr. Jones reported that physical examination showed that Plaintiff was well developed and in no acute distress; that she had full range of motion in the upper and lower extremities; that she had a longer step length on the right side than on the left; that she was able to heel and toe walk and squat without difficulty; that there was a negative standing flexion test, negative straight leg raise left and right; that there was some severe tenderness over the left and right piriformis; that there was no spinous process tenderness in the cervical, thoracic, or lumbar spine or sacral region; that there was "a little tenderness on the left SI joint but not anything that [was] really significant"; and that she had a lot of muscle weakness of the lower back extensors, gluteal and abdominal muscles. The assessment included chronic back pain most likely related to piriformis syndrome with left worse than right and

mild depression with chronic pain. Dr. Jones further reported that he did not find any evidence of focal neurological deficits and, considering the negative MRI, he did not believe that Plaintiff had a radiculopathy. Dr. Jones recommended strengthening and stretching exercises. Tr. 431-32.

Karen Snider, D.O., and Ed Douglas, D.O., reported on October 22, 2002, that they examined Plaintiff; that examination showed tenderness across the piriformis bilaterally, "but no specific tender points or trigger points in the piriformis [were] present"; that the assessment included low back pain, multifactorial, left leg radiculopathy, obesity, deconditioning, and somatic dysfunction of the lumbar, sacral, and pelvic region; that Plaintiff would benefit from physical therapy; that Plaintiff was to be set up with a pain clinic; and that Plaintiff was to be seen after her pain clinic visit. Tr. 412.

Dr. Snider and Dr. Douglas's notes reflect that they saw Plaintiff on November 12, 2002, at which time they reported that examination showed that muscle strength in the left lower extremity was 4/5, "however [Plaintiff] is apparently not cooperating because the motion is not consistent with true muscle or motor weakness"; that right extremity muscle strength was 5/5; and that in the seated position, the straight leg raising test did not elicit any specific back or leg complaints. The assessment on this date was low back pain, multi-factorial, obesity, deconditioning, and somatic dysfunction of the lumbar, sacral, and pelvic regions. Tr. 413-14.

On December 6, 2002, Dr. Snider and Dr. Douglas reported that a left gluteal trigger point was "noted that does exacerbate the pain in the left leg" and that the piriformis was "quite tight and tender." It was also reported on this date that "muscle strength [was] consistent with last time left lower extremity showing 4/5 possibly due to either uncooperative patient or secondary to pain"; that sensory appeared to be decreased in posterior left thigh; and that Plaintiff was encouraged to start pelvic coil exercises. Tr. 415.

In a report dated August 21, 2003, Robert Jackson, D.O., stated that he saw Plaintiff for evaluation of diffuse arthralgias and myalgias; that Plaintiff had chronic low back pain with left sciatic discomfort; that Plaintiff had failed to respond to physical therapy, OMT, and several medications, including steriods; and that Plaintiff's past history was significant for obesity, hypertension, chronic low back pain, depression and hyperlipidemia. Dr. Jackson reported that physical examination showed that Plaintiff's blood pressure was 124/82; that she weighed 260 pounds; that there were scattered myofascial tender points over the elbows, shoulders, low back, hips, and knees which was consistent with fibromyalgia; and that there were no signs of active synovitis or joint deformities. Dr. Jackson's impression was "non specific diffuse arthralgias and myalgias, probably secondary to fibromyalgia associated with irritable bowel symptoms, post menopausal state, physical deconditioning and obesity." Tr. 422-23.

Dr. Jackson reported on September 4, 2003, that he saw Plaintiff for a follow-up for diffuse fibromyalgia and non specific positive ANA titer. Dr. Jackson noted on this date that Plaintiff's ANA profile was completely normal; that the anti-CCP antibody for rheumatoid arthritis was normal; that Plaintiff's hepatitis B & C serology were both non reactive; that her CBC and UA were both unremarkable; that Plaintiff should strive to lose at least fifteen to twenty pounds to reduce the strain on her low back and weight-bearing joints; and that she should engage in an aerobic exercise program. Dr. Jackson suggested that Plaintiff have a rheumatology follow-up every one to two years. Tr. 426.

James H. Adams, D.O., reported that his impression from an MRI of January 5, 2004, included slight disc degeneration at L5-S1 which was "associated with a small left-paracentral annulus tear, which [had] an associated very small disc herniation (protrusion)"; "probably the earliest of

arthritic change of L5-S1 facet joints, but this [was] too subtle to diagnose with confidence"; "the remainder of the lumbar spine [was] negative -note being made of slight disc degeneration at L2-3"; and findings of hip and sacroiliac joints [were] negative." Tr. 444.

Jennifer Clark, M.D., of the Columbia Orthopaedic Group, reported on March 2, 2004, that:

[Plaintiff's] physical exam is somatized and basically unreliable. When asked to extend her knee, she would pull it backwards. When asked to pull it backwards, she would extend it. This was all done very subtly but no matter how I asked her to move her left leg she moved it in the opposite direction. Sensation was normal to pinprick and light touch in all four extremities. Height and weight without shoes reveals a height of 64 inches and weight 268 pounds. Blood pressure 142/64. Heart rate 76 and respirations 18. She walks with a normal gait without limp or list. In lying supine she appears to have a short left leg. She is markedly tender to even light touch over the lower abdomen anteriorly and complains of horrible pain but sensation is intact. She is tender to even light touch over the upper buttocks and posterior iliac crest. She was nontender in the low back. On formal exam she would bend forward less than 5 degrees and states, "that's all I'm getting" and when asked to extend, she would stand back to neutral. She had a negative standing flexion test and negative Gillett's test. On other testing done when asked to lay down on the table which is quite low approximately two feet off the ground she is able to lean over fully on that before lying down. She was noted to bend freely when otherwise moving about the room. She was able to stand on her heels and toes. She refused to squat more than just a few degrees stating back pain. She had a negative straight leg raise in both the sitting and lying position. She has no atrophy, no fasciculations. No neurotrophic skin changes. She bites her fingernails. There is no muscle spasm. She appeared in no discomfort whatsoever although she states her pain currently is around a 9. She had 2+ muscle strength reflexes at the deltoid, biceps, triceps, brachial radialis, finger flexors, patella and Achilles with 5/5 strength for shoulder abduction, elbow flexion and extension, wrist extension, wrist flexion, hand grip, hand intrinsics. Normal strength in both lower extremities when done more functionally. She is nontender in the sciatic notch. She was tender only over the right PSIS. She is nontender over the left PSIS.

Tr. 457.

Dr. Clark further reported that her impression included complaints of back pain with significant pain magnification behavior with a nonphysiologic exam and that there was "possible pelvic dysfunction but difficult to say at least on her nonperformance in the exam room." Dr. Clark also reported that Plaintiff had a "thorough workup"; that she was "neurologically intact"; that

9

Plaintiff was markedly obese; that based on Plaintiff's exam, Dr. Clark saw "no reason why [Plaintiff] could not continue doing her normal job as an LPN"; that Plaintiff had "no specific objective findings"; and that she saw "no restrictions of any activities based on physical exam." Tr. 458.

John Bailey, D.O., reported on March 5, 2004, that he administered epidural steriod injection to Plaintiff and that the diagnosis was disc degeneration lumbar spine, herniated nucleus pulposis, and radiculopathy. Tr. 603.

In a report dated March 12, 2004, James L. Tichenor, Ph.D., stated that he saw Plaintiff pursuant to a referral; that test results suggested that Plaintiff "may not have been honest and frank in answering questions and may be claiming virtues and denying negative characteristics"; that test results suggested that Plaintiff "may feel overwhelmed and may react to stress and avoid responsibility by developing physical symptoms"; that Plaintiff was functioning psychologically in a satisfactory manner; and that Plaintiff's complaints did not appear to be consistent with her clinical presentation. Tr. 453.

Records of the Northeast Regional Medical Center reflect that Plaintiff was admitted on July 22, 2004, by Dr. Sparks for nausea and vomiting; that she had an esophagogastroduodenoscopy biopsy on July 23, 2004; that a laboratory report states that the impression from the biopsy was minimal histologic change; that the diagnosis was esophageal ulcers and severe gastritis; and that Plaintiff was discharged on July 28, 2004. Tr. 739-850.

Charles M. Zeman, D.O., stated in a consultation report dated July 23, 2004, that Plaintiff's past medical history include findings that she was "[p]ositive for hypertension, asthma, thyroid disease, migraines and rheumatoid and fibromyalgia." Dr. Zeman's consultation was requested for Plaintiff's continuous nausea and vomiting. Tr. 728.

Robert Sparks, D.O., reported on August 10, 2004, that Plaintiff's principal diagnosis was unspecified gastritis and gastroduodenitis and that her secondary diagnoses included hypertension, esophageal reflux, unspecified acquired hypothryoidism, disorder of bladder, unspecified inflammatory polyarthropathy, pure hypercholesterolemia, morbid obesity, ulcer, irritable bowel syndrome, and unspecified hyperlipidemia. Tr. 851.

Records from Mid-America Orthopedic & Spine Institute, LLC, dated June 30, 2005, reflect that Plaintiff said that her tailbone was still hurting. Records of this date are otherwise not legible. Tr. 858.

A radiology report dated August 23, 2005, states that Plaintiff had a normal lumbar myelogram; that there was evidence of a herniated disc; and that Plaintiff had a normal CT myelogram of the lumbar spine. Tr. 854.

An office note completed by Dr. Bailey on September 15, 2005, states that Plaintiff reported that she still had aching pain in her lower back which radiates down the back of her left leg with occasional stabbing pain. Tr. 865.

Kelly Halma, D.O., reported on April 13, 2006, that she saw Plaintiff for evaluation of disability. Dr. Halma's report states that Plaintiff's chief complaint was low back pain with radiculopathy and that Plaintiff said this pain started on March 27, 2001; that "modifying facts that decrease her pain are medications, heat, especially hot baths and other activities that relax her muscles"; and that "[t]hings what make the pain worse are walking, standing, bending forward or backwards, cold, or cold weather, coughing, squatting, kneeling, going up and down stairs, getting out of a chair, driving, especially riding too long." Dr. Halma's report further states that Plaintiff's "[c]hief complaint number two" was thoracic back pain which had been going on for about two years

and that Plaintiff said that this pain was located between her shoulder blades; that she had associated symptoms of weakness in her arms and hands with increased dropping things out of her hands; that "[t]hings that make the pain better include pain medications, muscle relaxants, sitting or lying"; that "[a]ctivities that make it worse are standing and siting too long"; and that "[w]orking overhead, driving, especially reaching forward and typing seem to exacerbate it most." Dr. Halma's report further states that Plaintiff's "third chief complaint [was] neck pain with headache pain and that Plaintiff said that this pain occurred fifteen to twenty years ago; that she has this pain four to five times a week; that she also has "some positive vertigo"; that "[m]odifying factors that reduce her pain are Tylenol III, pain medications, NSAID's, muscle relaxants, lying down, osteopathic manipulative therapy and heat to her neck"; and that "[a]ctivities that make this worse are forward bending and to some extent backward bending of the neck exacerbates her pain and sometimes exacerbates her vertigo." Tr. 867-68.

Dr. Halma's report summarizes Plaintiff's medical records and states that she conducted a physical examination of Plaintiff. Dr. Halma's report states, in regard to an assessment of Plaintiff's gait, that Plaintiff refused to toe walk "due to unsteadiness and fear of falling"; that Plaintiff refused to stand on her left leg; that Plaintiff stood well on her right leg; that Plaintiff refused to squat due to exacerbation of pain; that, therefore, duck walk and arising from a squatting position could not be evaluated; that Plaintiff got on and off the table "with mild to none level of distress"; that "[s]tepping up an eight inch step was steady with the right foot slightly unsteady with the left." Tr. 868-73.

Dr. Halma reported that a "cervical compression test performed on the left side was negative for radiation of pain down into the left shoulder or the left arm, however [it] did cause [Plaintiff] some pain and tenderness at the C5 region on the right side with a left sided test"; that the "right

foraminal compression test was negative even for pain"; that the "cervical distraction test or decompression test was positive for relief of pain that was elicited on the left compression test and relieved her pain on the right"; that cranial nerves II through XII appeared grossly intact; that Plaintiff had "good fine motor movement by being able to touch her finger to [Dr. Halma's] finger and back to her nose multiple times, left to right"; that heel to shin was normal on the left and right; that Plaintiff had "no difficulty picking a nickel off a padded table with left or right hands"; that Plaintiff had "some weakness in her left dorsiflexion on the first toe"; and that "[i]t was normal on the right." Tr. 873.

In regard to Plaintiff's upper extremities, Dr. Halma reported that Plaintiff's shoulder region was 5/5; that elbow strength was 4/5 on the left; that dorsiflexion of the wrist was 4/5; that "otherwise upper extremity was five out of five"; that flexion and adduction were 4/5 in muscle strength"; that everything else was 5/5; that her grip was 4/5, in both hands; and that she was able to fully extend her hand.  Tr. 873-74.

In regard to Plaintiff's lower extremities, Dr. Halma reported that Plaintiff was "essentially" 5/5 in muscle strength and that she had "some slight weakness with hip internal rotation, but I would still call that a 5 out of 5."  Dr. Halma stated that Plaintiff's left knee strength was 4/5; that joint tenderness was present; and that foot muscle strength was 4/5 on the left and normal on the right. Dr. Halma further stated that an assessment of Plaintiff's spine showed that the thoracic spine had a decrease in the curvature of the kyphosis; that no scoliosis was noted; that Plaintiff had "pain throughout the whole region in the bilateral muscles"; and that she had "pain to deep palpation in the left and right sacral ileal joints." Tr. 874.

Dr. Halma's April 2006 report also states that Plaintiff refused to lift a box of unknown

weight from the floor; that this box weighed approximately eight and a half pounds; and that "[s]he even refused after I put it on the table and she said it would exacerbate her pain." Tr. 874. Dr. Halma's assessment included the following: (1) "Low back pain with non-specific left leg radiculopathy without radiological evidence; Possible DDX include SI joint dysfunction, piriformis spasms, non-specific diffuse arthralgias/myalgias, physical de-conditioning, secondary gain (due to varied physical exam findings from multiple independent physicians)"; (2) "Thoracic back pain likely secondary to posture, morbid obesity, physical de-conditioning"; and (3) "Knee pain bilaterally possibly secondary to physical de-conditioning, muscle tightness/spasms and morbid obesity." Dr. Halma further stated that "[t]he records provided show multiple inconsistencies in physical examination findings performed by multiple independent physicians within a relatively short period of time, sometimes within the same month (10/17/02 and 10/13/02)"; that "[t]he possibility of malingering behavior must be considered and ruled out"; and that Plaintiff's "refusal to lift a small box off a table and carry it to another table does not reflect well on her willingness to demonstrate her ability to perform common tasks." Tr. 874-75.

## IV.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R.

§§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities …" Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)). Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id. Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. §§ 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Afpel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's residual functional capacity and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. §§ 404.1520(f). Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. §§416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68

15

Fed. Reg. 51153, 51155 (Aug.26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. Cox, 495 F.3d at 617; Guillams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).

Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted). See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

> (1) The findings of credibility made by the ALJ;
>
> (2) The education, background, work history, and age of the claimant;
>
> (3) The medical evidence given by the claimant's treating physicians;
>
> (4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
>
> (5) The corroboration by third parties of the claimant's physical impairment;
>
> (6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and
>
> (7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ.& Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;
>
> (4) the dosage, effectiveness, and side effects of any medication; and
>
> (5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the

record which cause him to reject the plaintiff's complaints. Guillams, 393 F.3d at 801; Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

Residual functional capacity is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b-e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Coleman v. Astrue, 2007 WL 2323943 at *2 (8th Cir. Aug. 16, 2007); Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities.

Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used.  An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible.  Goff, 421 F.3d at 794("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical.");  Rautio, 862 F.2d at 180.  Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons.  Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell, 892 F.2d at 750.

## V.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled.  Onstead, 962 F.2d at 804.  Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm his decision as long as there is substantial evidence in favor of the Commissioner's position.  Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

Plaintiff alleges that the second ALJ[4] failed to evaluate the combined effect of all of her impairments because he failed to consider Plaintiff's diagnosis of fibromyalgia at any point in his opinion.  Indeed, an ALJ is required to consider the combination of a claimant's impairments.  At the second step of the sequential analysis, an ALJ must consider whether a claimant has a severe impairment; if the claimant is found not to have a "severe impairment," he is not disabled.  See Brown

––––––––––––––––––––

[4]    All references are to the second ALJ unless otherwise stated.

v. Barnhart, 390 F.3d 535, 538 (8th Cir.2004) (citing 20 C.F.R. § 404.1520(c)). "'Severe impairment' is defined as any impairment *or combination of impairments* that significantly limits physical or mental ability to perform basic work, not considering age, education, and work experience." Id.(citing 20 C.F.R. § 404.1520(c)) (emphasis added). "At the third step, if the claimant has an impairment that the Commissioner has deemed is so severe as to preclude ability to work, and has had or will have that impairment for at least twelve months, the claimant is disabled." Id. (citing 20 C.F.R. § 404.1520(d)). Also, "[i]n determining a claimant's RFC, 'the ALJ must consider the effects of the *combination of both physical and mental impairments*,' Stormo v. Barnhart, 377 F.3d 801, 807 (8th Cir.2004), to 'determine whether the combination of ... impairments is medically equal to any listed impairment,' Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir.2003) (quoting 20 C.F.R. §404.1526(a))." Raney v. Barnhart, 396 F.3d 1007, 1001(8th Cir. 2005). The Eighth Circuit held in Raney that the ALJ's decision that the claimant was not disabled was supported by substantial evidence and was consistent with the Regulations where the ALJ considered the claimant's impairments, expressly stated that he considered the claimant's impairments "*individually and in combination*," and *based his RFC assessment on the combination of the claimant's impairments.* Id. Where an ALJ discusses a claimant's impairments individually and specifically finds that his "medically determinable impairments (individually or in combination)" do not meet or medically equal the listed impairments, the ALJ's analysis in regard to considering the combination of impairments is sufficient. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992).

Stedman's Medical Dictionary, 725 (28th ed. 2006), defines fibromyalgia as a "common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown." Stedman's Medical Dictionary further states:

> The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, lumbar spine, or anterior chest). Addition, point tenderness must be found in at least 11 of 18 specified sites. Tender points are sharply localized and often bilaterally symmetric. Some points may correspond to sites of pain and others may be painless until palpated. ... Fibromyalgia frequently occurs in conjunction with migraine headaches, temporomandibular joint dysfunction, irritable bowel syndrome, restless legs syndrome, chronic fatigue, and depression.

Id.

Stedman's Medical Dictionary, 671 (27th ed. 2000), defines fibromyalgia as "chronic pain of musculoskeletal origin but uncertain cause." As does the 28th Edition, the 27th Edition of Stedman's specifies that the diagnostic criteria "include pain on both sides of the body, both above and below the waist" and that "there must be point tenderness in at least 11 of 18 specified sites."[5] The Eighth Circuit holds that trigger-point test findings consistent with fibromyalgia serve as objective evidence of the disease. Johnson v. Metro. Life Ins. Co., 437 F.3d 809 (8th Cir. 2006).

The ALJ acknowledged in his procedural history that Plaintiff had been diagnosed with possible fibromyalgia. Also, the ALJ incorporated the first ALJ's consideration of Plaintiff's medical records, including the opinions of treating and examining doctors. Significantly, the first ALJ specifically mentioned Dr. Jackson's August 2003 diagnosis of fibromyalgia. The ALJ concluded that Plaintiff "does not have most of the signs typically associated with chronic, severe musculoskeletal pain." The ALJ also specified the typical signs of severe musculoskeletal pain that Plaintiff does not exhibit, including muscle atrophy, persistent or frequently recurring muscle spasms, medically-established neurological deficits or other signs of nerve root impingement, significantly abnormal x-rays or other diagnostic tests, consistent positive straight leg raising, inflammatory signs, or bowel

---

[5] The ALJ's decision was issued in June 2006. As such, the ALJ could have referenced the 2000 edition or the 2006 edition of Stedman's Medical Dictionary.

or bladder dysfunction. The ALJ also considered that the medical evidence did not establish Plaintiff's inability to ambulate effectively or to perform find and gross movements effectively on a sustained basis. Thus, despite Plaintiff's assertion to the contrary, the ALJ did consider Plaintiff's claim of fibromyalgia and the medical evidence in this regard. See Stedman's Medical Dictionary, 725 (28th ed. 2006); Stedman's Medical Dictionary, 671 (27th ed. 2000).

Moreover, to the extent that the ALJ did not cite specific evidence of fibromyalgia, this does not indicate that such evidence was not considered. See Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 n.3 (8th Cir. 2005) ("The fact that the ALJ's decision does not specifically mention the [particular listing] does not affect our review."); Montgomery v. Chater, 69 F.3d 273,275 (8th Cir. 1995). See also Wheeler v.Apfel, 224 F.3d 891, 896 n.3 (8th Cir. 2000) (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted ... [and][a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.") (internal citations omitted); Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996) ("Although specific delineations of credibility findings are preferable, an ALJ's arguable deficiency in opinion-writing technique does not require us to set aside a finding that is supported by substantial evidence.") (citing Carlson v. Chater, 74 F.3d 869 (8th Cir. 1996)).

Further, to the extent that the ALJ did not elaborate on Plaintiff's possible impairment of fibromyalgia, such a failure does not require reversal because the record supports the ALJ's overall conclusion. See Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003). In this regard the court notes that Dr. Snider and Dr. Douglas reported in October 2002, that Plaintiff showed no specific trigger points. Plaintiff was diagnosed with fibromyalgia by Dr. Jackson August 21, 2003.

Dr. Jackson stated in his medical note from that day that examination of Plaintiff revealed "scattered myofascial tender points over the elbows, shoulders, low back, hips, and knees consistent with fibromyalgia." Tr. 423. Dr. Jackson characterized Plaintiff's condition as "non-specific diffuse arthralgias and myalgias, probably secondary to fibromyalgia associated with irritable bowel symptoms, post menopausal state, physical deconditioning and obesity." Tr. 422. Dr. Jackson described Plaintiff's tender points as scattered and gave the general regions but did not describe these tender points as being "sharply localized" or "bilaterally symmetric." Stedman's Medical Dictionary, 725 (28th ed. 2006); Stedman's Medical Dictionary, 671 (27th ed. 2000). Also, on September 4, 2003, Dr. Jackson characterized Plaintiff's fibromyalgia as diffuse and did not identify specific tender points.

The only references to Plaintiff's fibromyalgia after Dr. Jackson's 2003 reports are in discussions of Plaintiff's medical history. Dr. Zeman's July 23, 2004 consultation note, for example, listed fibromyalgia among the diseases for which Plaintiff had tested positive in the past. Also, in her April 13, 2006 disability evaluation of Plaintiff, Dr. Halma listed Plaintiff's 2003 diagnosis of fibromyalgia as part of her medical history. Dr. Halma's assessment of Plaintiff, however, did not include fibromyalgia although Dr. Halma did state that Plaintiff had, among other things, piriformis spasms and non-specific diffuse arthralgias/myalgias.

Upon discrediting Plaintiff's complaint of disabling pain the ALJ considered that no doctor who treated Plaintiff or who examined her implied that she is disabled or incapacitated and that no doctor has placed any specific long-term limitations on Plaintiff's ability perform exertional activities beyond those the which a vocational expert was asked to assume when considering Plaintiff's employability. A record which contains no physician opinion of disability detracts from claimant's

subjective complaints. See Edwards v. Secretary of Health & Human Services, 809 F.2d 506, 508 (8th Cir. 1987); Fitzsimmons v. Mathews, 647 F.2d 862, 863 (8th Cir. 1981). Further, a record, such as that in the matter under consideration, which does not reflect physician imposed restrictions suggests that a claimant's restrictions are self-imposed rather than by medical necessity. See Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004) (citing Johnson v. Chater, 108 F.3d 942, 947 (8th Cir. 1997)) ("[T]here is no medical evidence supporting [the claimant's] claim that she needs to lie down during the day."); Fredrickson v. Barnhart, 359 F.3d 972, 977 n.2 (8th Cir. 2004) ("There is no evidence in the record that [the claimant] complained of severe pain to his physicians or that they prescribed that he elevate his foot or lie down daily.").

The ALJ considered that in a consultative orthopedic examination note of March 2004 Dr. Clark opined that Plaintiff *magnified her symptoms*. Dr. Clark also reported that Plaintiff was neurologically intact; that Plaintiff was *uncooperative*; that her physical exam was unreliable; that based on the exam, Dr. Clark thought Plaintiff could continue doing her normal job as an LPN; and that Plaintiff did not have any exertional or other physical limitations. The ALJ also considered that Dr. Bailey reported in September 2005 that Plaintiff still had radiating pain but that this "fact was belied by [Plaintiff's] negative" myelogram and CT scan a few weeks earlier. Also, Dr. Tichenor reported in a psychological report of Plaintiff of March 2004, among other things, that Plaintiff's *pain complaints were not consistent with her clinical presentation*. Dr. Snider and Dr. Douglas reported in November 2002, that Plaintiff was *not cooperative* and that her motion was not consistent with true muscle or motor weakness. These doctors also reported in December 2002 that Plaintiff's muscle strength possibly was due to her being *uncooperative* or secondary to pain. Certainly, when examining/and or treating physicians express doubts about the validity of a claimant's complaints, this

is a factor which discounts the claimant's credibility. Edwards, 809 F.2d at 508. See also Baker v. Barnhart, 457 F.3d 882, 892-93 (8th Cir. 2006) (holding that the ALJ properly discounted the claimant's complaints of pain upon considering reports that the claimant exaggerated his symptoms during an examination); Jones v. Callahan, 122 F.3d 1148, 1151-52 (8th Cir. 1997) (holding that exaggeration of symptoms is a factor to be weighed in evaluating subjective complaints of pain); Russell v. Secretary of Health, Ed. and Welfare, 540 F.2d 353, 357 (8th Cir. 1976) (holding that where doctors reported that the claimant was exaggerating her ailments and was uncooperative, the record did not establish the requisite degree of certainty that the claimant was disabled).

The ALJ also considered Plaintiff's daily activities including that Plaintiff said she was able to feed, dress and bathe herself and that she sometimes needs help getting in and out of the bathtub. The ALJ further considered that Plaintiff drove to the hearing, which was about a one-hour drive, stopping one time to walk, and that she testified that she read, watched television a lot, went to the library about once a month and to the store about twice a month, visited her father and sister about once a week, drove her son to meetings once a month and attended parent-teacher conferences. While the undersigned appreciates that a claimant need not be bedridden before she can be determined to be disabled, a claimant's daily activities can nonetheless be seen as inconsistent with her subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. Eichelberger, 390 F.3d at 590 (holding that the ALJ properly considered that the plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001); Onstead, 962 F.2d at 805; Murphy, 953 F.2d at 386; Benskin, 830 F.2d at 883; Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir. 1987). The Eighth Circuit holds that allegations of disabling "pain may be discredited by evidence

of daily activities inconsistent with such allegations." Davis, 239 F.3d at 967 (citing Benskin, 830 F.2d at 883). "Inconsistencies between [a claimant's] subjective complaints and [his] activities diminish [his] credibility." Goff, 421 F.3d at 792 (8th Cir.2005) (citing Riggins v. Apfel, 177 F.3d 689, 692 (8th Cir. 1999)). See also Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001); Nguyen, 75 F.3d at 439-31(holding that a claimant's daily activities including visiting neighbors, cooking, doing laundry, and attending church were incompatible with disabling pain and affirming denial of benefits at the second step of analysis). The court finds that the ALJ properly considered Plaintiff's daily activities upon choosing to discredit his complaints of debilitating pain. The court further finds that substantial evidence supports the ALJ's decision in this regard.

At Step 1 of the sequential analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 2001. At Step 2, the ALJ considered the nature of Plaintiff's alleged impairments and their severity. After considering the evidence of record the ALJ concluded that Plaintiff's symptoms were caused by possible piriformis syndrome, in addition to degenerative disc disease, probable deconditioning, hypertension, hyperlipidemia, and hypothyroidism. The ALJ's decision reflects that he did not ignore Plaintiff's complaints and alleged impairments but that, as required by the Regulations and case law, he considered the record as a whole, including the combination of Plaintiff's impairments. See 20 C.F.R.§ 404.1520(c); Brown, 390 F.3d at 538. At Step 3, the ALJ then found that Plaintiff's impairments whether considered individually or in combination do not meet or equal in severity the requirements of any impairment listed in Appendix 1, Subpart P, Regulations No. 4. At Step 4, the ALJ then determined Plaintiff's RFC based on the combination of her impairments which he found credible and concluded that Plaintiff's past relevant work as a LPN did not require the performance of work-related activities precluded by her RFC. The

ALJ, therefore, found that Plaintiff is not disabled within the meaning of the Act. As such, the court finds that the ALJ considered the combination of Plaintiff's impairments as required by the Regulations and case law; that the ALJ's decision is supported by substantial evidence; and that it is consistent with the Regulations and case law. <u>Raney</u>, 396 F.3d at 1001; <u>Brown v. Barnhart</u>, 390 F.3d at 538

## VI.
## CONCLUSION

The court finds that the ALJ's decision is supported by substantial evidence contained in the record as a whole, and that, therefore, the Commissioner's decision should be affirmed.

**ACCORDINGLY,**

**IT IS HEREBY RECOMMENDED** that the relief sought by Plaintiff in her Brief in Support of Complaint be **DENIED**; Doc. 11

The parties are advised that they have eleven (11) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

<u>/s/Mary Ann L. Medler</u>
MARY ANN L. MEDLER
Dated this <u>25th</u> day of October, 2007.        UNITED STATES MAGISTRATE JUDGE